UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IESHA GRANT, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-3278 |
| | § | |
| CITY OF HOUSTON, DIANA | § | |
| BOCANEGRA, ANTONIO GARCIA, KYE | § | |
| NAQUIN, DAVID RUSSEL, ROBERT | § | |
| SIMPSON, and CHASE COMIER, | § | |

Third-Party Defendants.

## OPINION AND ORDER

Pending before the Court in the above referenced Third-Party action, removed from state court, grounded in 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendment of the Federal Constitution, and alleging that in an illegal search of the home of Third-Party Plaintiff Iesha Grant ("Grant") at 2510 Dallas Street, Houston, Texas, Grant was deprived of property without due process of law by the killing of her dog by Defendant Houston Police Officers, is Third-Party Defendants the City of Houston, Diana Bocanegra, Antonio Garcia, Kye Naquin, David Russell, Robert Simpson, and Chase Cormier's Rule 12(c) motion for judgment on the pleadings or, in the alternative, motion for summary judgment (instrument #38) on Grant's Second Amended Third-Party Conplaint (#17, pp. 3-8) against them.[1]

**Standards of Review**

---

[1] Because the original forfeiture action has been resolved and Third-Party Defendants Steven Fisher, Leslie McMullen, Allan Comstock, Richard Bass, Damian Garcia and Carol Neff dismissed without prejudice pursuant to a stipulation (instruments #61, 63, 64, and 65), in an order dated September 9, 2014, United States Magistrate Frances Stacy realigned the parties and designated Iesha Grant as Plaintiff and the Third-Party Defendants as Defendants. Instrument #70.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can  be rendered by looking to the substance of the pleadings and any judicially noticed facts."  *Herbert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990), *citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 509-10 (1990).  The same standard used to review motions under Rule 12(b)(6) applies to motions under Rule 12(c).  *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

Federal Rule of Civil Procedure 8(a)(2) provides, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The plaintiff's legal conclusions are not entitled to the same assumption.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S. 662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure*

§ 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 556 U.S. at 679, the Supreme Court stated that "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 129 S. Ct. at 1949. The plaintiff

must plead specific facts, not merely conclusory allegations, to avoid dismissal.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ."  *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

"Rule 12(b) is not a procedure for resolving contests about the facts or the merits of a case." *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, __ F. Supp. 2d __, Civ. A. No. 1:12-CV-417, 2013 WL 244651, *3 (E.D. Tex. Jan. 22, 2012), *citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure:  Civil 2d* § 1356, at 294 (1990).

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the Court may examine  the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record.  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994).  *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)("the court may consider . . . matters of which judicial notice may be taken").  Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011).  "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which the nonmovant bears the burden of proof at trial; a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial.  *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact

concerning every element of its cause(s) of action.  *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986).  "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252.  The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"  *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S.  at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence.  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).  The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a

genuine issue of material fact for trial."  *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which the nonmovant bears the burden of proof at trial; a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the

essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence.  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).  The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial."  *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

**Allegations of Grant's Second Amended Third-Party Complaint (#17)**

At all relevant times Grant was a resident of Houston, Texas, a Nurse Practitioner licensed by the State of Texas, and a person never previously arrested, no less convicted of a crime.

Defendants Diana Bocanegra, Antonio Garcia, Kye Naquin, David Russell, Robert Simpson, and Chase Cormier were employed at the relevant times as law enforcement officers by the City of Houston and are sued in their individual capacities only.  The City of Houston is a political subdivision of the State of Texas in Harris County and acts by and through its policy-makers, agents, and employees.

Grant alleges that on September 1, 2010 officers of the Houston Police Department came to her home to execute an arrest warrant for her brother, Thomas Grant, who lived there with her and was on probation for possessing or selling unlabeled recordings, but who had violated his probation by testing positive for marijuana.  Thomas Grant was taken into custody, but purportedly without consent and without a search warrant, Defendant police officers performed an illegal search of Grant's home.  *Inter alia* they found Grant's 12-year-old terrier-mix dog, which was recovering from a recent amputation of its right hind leg.  Defendants placed the dog in the garage.  They then obtained a search warrant, which contained misleading information, including that Grant was a "provider" [of home health care], but not reporting that she was a licensed Nurse Practitioner.  During this second search Defendants entered the garage and shot her dog, while Grant sitting in the next room.  They also located and seized $35,582.00 in cash, and reported that they recovered approximately 103.6 grams of codeine, which was actually 10.3 grams of cough syrup.

The forfeiture claim by the State of Texas against Grant has been dismissed pursuant to stipulation, with the State agreeing to return the cash and Grant agreeing to dismiss her third-party claims against Third-Party Defendants Steven Fisher, Leslie McMullen, Allan Comstock, Richard Bass, Damian Garcia and Carol Neff.  #62 and 65.  Thus the Court addresses only Grant's claim that the remaining Defendants violated her Fourth Amendment rights in other ways and deprived her of her dog in violation of the Fourth and Fourteenth Amendments.  She seeks compensation and attorneys' fees.

**Applicable Law**

Title 42 U.S.C. § 1983 does not grant substantive rights, but provides a vehicle for a plaintiff to vindicate rights protected by the United States Constitution and other federal laws.

*Albright v. Oliver*, 510 U.S. 266, 271 (1994).  It provides a cause of action for individuals who have been "depriv[ed] of [their] rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law.  *Id.*

Municipalities and other bodies of local government are "persons" within the meaning of § 1983.  *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978).  "A municipality cannot be held liable *solely* because it employs a tortfeasor-–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.* at 691.  A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his constitutional rights.  *Monell*, 436 U.S. at 690-91.

To state a claim for municipal liability under § 1983, a plaintiff must identify (a) a policy maker, (b) an official policy [or custom or widespread practice], and (c) a violation of constitutional rights whose "moving force" is the policy or custom.  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)(a plaintiff must show that the unconstitutional conduct is attributable to the municipality through some official custom or policy that is the "moving force" behind the constitutional violation)(*citing Monell*, 436 U.S. at 694), *cert. denied*, 534 U.S. 820 (2001).  The Fifth Circuit has defined an official policy for purposes of § 1983 as "'[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's law-making officials or by an official to whom the lawmakers have delegated policy-making authority.'"  *Okon v. Harris County Hospital District*, 426 Fed. Appx. 312, 316 (5th Cir. May 23, 2011), *quoting Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)(*en banc*), *cert. denied*, 472 U.S. 1016 (1985).[2]  Alternatively, a policy may be "'a

---

[2]  When a policymaker commits the act at issue, that act may establish the policy if the policymaker must be "unconstrained by policies imposed from a higher authority."  *Okon*, 426 Fed. Appx. at 316, *citing Hampton Co. v. Nat'l Sur. LLC v. Tunica  County*, 543 F.2d  221,  227

persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'"  *Id., citing id.*, and *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010)("A pattern of conduct is necessary only when the municipal actors are *not* policymakers")[, *cert. denied*, 131 S. Ct. 3059 (2011)].  "Allegations of an isolated incident are not sufficient to show the existence of a custom or policy."  *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992).  "The governing body of the municipality or an official to whom that body has delegated policy-making authority must have actual or constructive knowledge of such a custom."  *Okon*, 426 Fed. Appx. at 316, *citing Bennett*, 735 F.2d at 862.  "'Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information,'" while "constructive knowledge 'may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.'"  *Id., citing Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)(*en banc*), *cert. denied*, 472 U.S. 1016 (1985).  "Deliberate indifference" is a "stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," for which "[a] showing of simple or even heightened negligence will not suffice"; it requires a plaintiff to show that "'in the light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'"  *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir.

---

(5th Cir. 2008).  In such a case the court must determine which official or government body has final policymaking authority for the local government unit regarding the action in dispute. *Id.*

2010)(*quoting City of Canton*, 489 U.S. at 390), *cert. denied*, 131 S. Ct. 2094 (2011). "Usually a plaintiff must show a pattern of similar violations, and in the case of an excessive force claim . . . the prior act must have involved injury to a third party." *Id.*; *Rodriguez v. Avita*, 871 F.2d 552, 554-55 (5th Cir. 1959). "[A] single incident of an alleged constitutional violation resulting from the policy may serve as a basis for liability so long as that violation was an obvious consequence of the policy. . . . [A[ pattern of misconduct is not required to establish obviousness or notice to the policymaker of the likely consequences of his decision." *Brown v. Bryan County, OK.*, 219 F.3d 450, 460 (5th Cir. 2000), *citing City of Canton*, 489 U.S. at 396 ("Where a section 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of constitutional rights of their citizens, the dictates of *Monell* are satisfied.").

"A police officer may make a protective sweep, including of a residence, following a seizure or an arrest. 'The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and other present at the scene.'" *Seyfried v. City of Lewisville Police Dept.*, 2014 WL 4300973, at *18 (E.D. Tex. Aug. 28, 2014), *quoting U.S. v. Albarado*, 555 Fed. Appx. 353, 357 (5th Cir. Feb. 6, 2014), *citing U.S. v. Maldonado*, 472 F.3d 388, 393-94 (5th Cir. 2006), *abrogated in part on other grounds*, *Kentucky v. King*, 131 S. Ct. 1849, 1859-60 (2011).

The Supreme Court has held that "all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, . . . or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard rather than under a 'substantive due process' approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive

governmental conduct, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Dubbed the "more specific provision rule, . . . if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 834-44 (1998).  The killing of a pet, which is personal property, by a police officer using excessive force is thus properly evaluated under the Fourth Amendment. *Schor v. North Braddock Borough*, 801 F. Supp. 2d 369, 379 (W. D. Pa. 2011).  *In accord*, *Kincheloe*, 2009 WL 3381047, at *9, in which the court explains,

> Where a constitutional amendment provides an explicit textual source of protection against certain government misconduct, the amendment is the guide for analysis of the claim rather than the generalized notion of substantive due process. *Albright v. Oliver*, 510 U.S. 266, 273 . . . (1994); *Graham v. Connor*, 490 U.S. 386, 395 (1989). . . . . Because the substantive component of the Due Process Clause does not provide Plaintiffs with any additional relief than that provided by their Fourth Amendment claim, any possible substantive due process claim should be dismissed.  *See Folkers v. City of Waterloo*, 582 F. Supp. 2d 1141, 1155 (N.D. Iowa 2008)(holding that Fourth Amendment rather than substantive due process provision of the Fourteenth Amendment was proper means for dog owner to bring claim against officer's seizure of his dog); *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 270 (D. Conn. 2005)(where officer killed pet dog, substantive due process claim was not warranted since Fourth Amendment provided explicit protection against unreasonable seizure).

Grant is suing for the shooting death of her dog by HPD police officers as well as other violations of Grant's rights under both the Fourth and Fourteenth Amendments.  The Fourth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, states, "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated . . . ."  U.S. Const. amend. IV.  A "seizure of property exists when "there is some meaningful interference with an individual's possessory interests in that property." *U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984).

It is well recognized that the shooting of a pet dog, which is the personal property of the owner (destruction of property), by a police officer may constitute a seizure under the Fourth Amendment if it was objectively unreasonable.  *See, e.g., Villo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008)("Every circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment."); *Andrews v. City of West Branch*, 454 F.3d 914, 918 (8th Cir. 2006)("[A]n officer commits an unreasonable, warrantless seizure of property, in violation of the Constitution, when he shoots and kills an individual's family pet when the pet presented no danger and when non-lethal methods of capture would have been successful."); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir.), *cert. denied*, 546 U.S. 1061 (2005);  *Altman v. City of High Point, N.C.*, 330 F.3d 194, 204-05 (4th Cir. 2003)("North Carolina is no stray when it comes to the trend in favor of treating dogs a personal property"; "when the officers destroyed the dogs, they 'seized' the plaintiff's 'effects'" under the Fourth Amendment."); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209-11 (3d Cir. 2001)("holding that the killing of a person's dog by a law enforcement officer constitutes a seizure under the Fourth Amendment"); *Maldonado v. Fontanes*, 568 F.3d 263, 271 (1st Cir. 2009)("The killing of a person's pet dog or cat by the government without the person's consent is also a seizure within the meaning of the Fourth Amendment."); *Kincheloe v. Caudle*, No. A-09-CA-010-LY, 2009 WL 3381047, at *6 & n.3 (W.D. Tex. Oct. 16, 2009).

Qualified immunity, an affirmative defense, protects government officials in their personal (or "individual") capacity performing discretionary functions not only from suit, but from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, __, 129 S. Ct. 808, 815 (2009).  Thus the Court examines whether the "officer's conduct violated a constitutional right" and "whether the right was clearly established" at the time of the conduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Either prong may be addressed first.  *Pearson*, 129 S. Ct. at 808.  A right is clearly established when "the contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violated that right."  *Werneck v. Garcia*, 591 F.2d 386, 392 (5th Cir. 2009)(citations omitted).  *See also Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)(the court applies an objective standard "based on the viewpoint of a reasonable official in light of the information available to the defendant and the law that was clearly established at the time of defendant's actions.").  To be clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.'"  *Kinney v. Weaver*, 367 F.3d 337, 349-50 (5th Cir. 2004), *quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "The 'clearly established' standard does not mean that official's conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'"  *Id.* at 350, *quoting Anderson*, 483 U.S. at 640.  "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established."  *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 2740 (2012).  Officials who act reasonably but mistakenly are entitled to qualified immunity; the defense protects all government employees but "the plainly incompetent or those who knowingly violate the law."  *Anderson*, 483 U.S. at 641; *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "[A] defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the

United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur County, Texas*, 245 F.3d 447, 457 (5th Cir. 2001).  The officer is "entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions," even if the conduct violated the plaintiff's constitutional right.  *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)(*en banc*).

Although qualified immunity is an affirmative defense, "plaintiff has the burden to negate the assertion of qualified immunity once properly raised."  *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009).  To meet this burden the plaintiff must allege facts showing that the defendants committed a constitutional violation under the current law and that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.  *Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005).

In *Elliott v. Perez*, 751 F.2d 1472, 1473 (5th Cir. 1985), the Fifth Circuit held that when defendant-official raises a qualified immunity defense in his individual capacity, a heightened pleading standard must be met by Plaintiff to show with factual detail and particularity why the defendant official cannot maintain the qualified immunity defense.  The Fifth Circuit subsequently decided not to apply *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)(striking down the heightened pleading requirements in § 1983 actions against municipalities) to claims against individual government officials in their individual capacities, regarding which "we are still bound by *Elliott* and its progeny."  *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).  In *Schultea v. Wood*, 47 F.3d 1427, 1429-34 (5th Cir. 1995)(*en banc*), discussing development of qualified immunity defense and pleading rules, the Fifth Circuit further opined, "When a public official pleads the affirmative defense of qualified

immunity in his answer, the district court may, on the official's motion or its own, require the plaintiff to reply to that defense in detail.  By definition, the reply must be tailored to the assertion of qualified immunity and fairly engage its allegations.  A defendant has an incentive to plead his defense with some particularity because it has the practical effect of requiring particularity in the reply."  *See also Floyd v. City of Kenner, La.*, 351 Fed. App'x 890, 893 & n.2 (5th Cir. 2009).

In *Morgan v. Hubert*, 335 Fed. Appx. 466, 472-73 (5th Cir. 2009), the Fifth Circuit reviewed *Schultea*'s standard (requiring plaintiff to support a "claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's contact at the time of the alleged acts").  The panel pointed to the reasoning in *Schultea* in requiring a heightened pleading standard in the face of a defendant's assertion of qualified immunity:

> We did not ground any such requirement in Rule 9(b), but nevertheless required a plaintiff to plead more than conclusions.  Specifically, we reasoned that "a plaintiff cannot be allowed to rest on general characterizations, but must speak to the factual particulars of the alleged actions, *at least when those facts are known to the plaintiff and are not peculiarly within the knowledge of defendants* [emphasis added by *Morgan* panel]."  "Heightened pleading requires allegations of fact focusing specifically on the conduct of the individual who caused the plaintiffs' injury."  *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999).

*Morgan*, 335 Fed. Appx. at 469-70, *citing Schultea*, 47 F.3d at 1432-34.

Some courts have interpreted certain language in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196-97 (1989)(holding that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause") to give rise to what is known as the "state-created danger" theory of liability: "While the State may have been aware of the dangers that [plaintiff] faced . . ., it played no part in their creation, nor did it do anything to render him any more vulnerable to them . . . . [I]t placed him no worse a position than that in which he would have been had it not acted at all."

*Estate of C.A. v. Castro*, 547 Fed. Appx. 621, 626 (5th Cir. Tex. Nov. 25, 2013).[3]   The Fifth

Circuit has evaluated the theory and thus far has not adopted it.   *Id.*; *Doe v. Covington Cnty. Sch.*

*Dist.*, 675 F.3d 849, 863-65 (5th Cir. 2012)(*en banc*).   In *Dixon v. Alcorn County School Dist.*,

499 Fed. Appx. 364, 366-67 (5th Cir. 2012), the panel opined that were the Fifth Circuit to adopt

the theory, to prevail a plaintiff would have to prove "(1) that the environment created by the

state actor is dangerous, (2) the state actor must know it is dangerous (deliberate indifference),

and (3) the state actor must have used its authority to create an opportunity that would not

otherwise have existed for the third party's crime to occur."   Furthermore, the state actor must

have specific knowledge of an immediate danger facing a known victim for the theory  to apply.

*Id., citing Rios v. City of Del Rio, Texas*, 444 F.3d 417, 424 & n.7 (5th Cir. 2006).   That a

defendant's policy or procedure creates a risk of harm to the public in general is not adequate to

satisfy the known victim requirement.   *Estate of C.A.*, 547 Fed. Appx. at 627.   The parameters of

the "known victim requirement are not well developed in the Fifth Circuit because it has not

adopted the theory.   *Id.* at 527 n.2, *citing Rios*, 444 F.3d a 423 ("There is no allegation that any

alleged action or failure to act on the part of [the officer] was taken by him with the actual

purpose or intention of causing injury to *anyone*, much less [the victim]."), *Saenz v. Heldenfels*

*Bros., Inc.*, 183 F.3d 389, 391-92 (5th Cir.)("Unlike the deputy in [*Ross v. U.S.*, 910 F.2d 1422

(7th Cir. 1990)], Gonzalez was neither aware of an *immediate danger facing a known victim*, nor

did he use his authority to prevent the appellants from receiving aid.").

**Defendants' Motion for Judgment on the Pleadings or,**

---

[3]  A state actor may be liable under § 1983 under the state-created danger theory if that actor
created or knew of a dangerous situation and affirmatively placed the plaintiff in that situation.
*Carlton v. Cleburne County*, 93 F.3d 505, 508 (8th Cir. 1996)("In cases [under this theory] the
courts have uniformly held that state actors may be liable if they affirmatively created the
plaintiffs' peril or acted to render them more vulnerable to danger.   In other words, the
individuals would not have been in harm's way but for the government's affirmative actions.").

**in the Alternative, Motion for Summary Judgment (#38)**

Because both sides have submitted substantial documentary evidence, in the interests of justice the Court chooses to address the motion for summary judgment.

Defendants' summary of the facts adds substantially more detail to Grant's bare-bones recitation and is supported by documentary evidence. Defendants assert that when the police officers, with an arrest warrant for Thomas Grant, went to Grant's house on September 1, 2010 to arrest Thomas Grant for violating his probation by smoking marijuana, in securing the back of the residence they first saw Thomas Grant on a second floor balcony holding an infant. He then disappeared into the house and Officer Cormier subsequently observed him through a window still holding the infant while "flushing liquid from a large, dark prescription-type bottle" down the toilet. Thomas Grant exited the house and was taken into custody and put in a patrol vehicle.[4] Some of the officers then performed a protective sweep of the residence to see if any other people were present but found none. They define a "protective sweep" as a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Defendant Russell, a sergeant then working at the Fugitive Unit, a warrant execution team who served the arrest warrant on Thomas Grant, testified at his deposition (Ex 10 at pp. 30-34) that after Thomas Grant came out of the house and was secured by the officers, Officer Russell and others went in and performed a protective sweep of the house to be sure "there was no one else in the house that could harm us or him or anyone else in the area" or any more children inside. They found no one else in the house. In his expert report, Donald R. McKinney, Assistant Chief of Police Criminal Investigations Command, concluded, "The initial entry and sweep of the house was limited to checking rooms of the residence to determine the

---

[4] Officer Damian Garcia took the infant and held him in a patrol car until his mother, Grant, arrived home. Ex. 3, Damian Garcia Declaration.

presence of any other persons who would pose a threat to officers and for the welfare of vulnerable persons such as children remaining in the residence.  Based on the circumstances at the time of the incident, I believe the officers' immediate entry and limited sweep of the residence for other persons in the residence during the execution of the valid arrest warrant was reasonable."  Ex. 7 at pp. 4-5.

After the protective sweep, one of the officers called Narcotics Division, and Sergeant Antonio Garcia of the Narcotics Division came to the house and took charge of the narcotics investigation.

Later Grant arrived home in scrubs and told Officer Bocanegra that she was the mother of the infant and worked at a clinic off the loop as a "provider" of home health care.  When asked for permission to search her residence for additional narcotics, she refused consent.  Garcia directed Officer Bocanegra to get a warrant to search for narcotics, which Bocanegra obtained from a magistrate.  The police then conducted a thorough search of the home pursuant to the warrant.

A canine narcotics officer, Steven Fisher ("Fisher"), was called and with his dog, Kinta, he scanned the area.  Ex. 4, Declaration and Offense Report of Steve Fisher.  He found a snarling, growling dog in a bathroom of a bedroom on the third floor of the residence.  An experienced dog handler, he was able to put a leash on it, and took it  to the garage on the ground floor, where he left it with another dog already there.  He then conducted a thorough search of the residence with Kinta.[5]  Ex. 4.

After transporting Thomas Grant to the Central Jail and booking him, Officer Simpson and Sergeant Garcia returned to the residence and were told to search the first floor garage for

---

[5] During the search Kinta alerted to a partial green Ecstasy pill on a shelf and to a large amount of cash in a closet.

narcotics pursuant to the warrant.  Exs. 2 (HPD Officer Robert Simpson ("Simpson") Affidavit)

and 3 (Declaration of HPD Officer Damian Garcia).  Simpson states,

> I was attacked by the dog and felt threatened to the extent that the only way I
> could extract myself from the situation was to shoot at the dog.  This dog was not
> a small dog.  It was fast, aggressively snapping and biting at my legs and even
> ignoring my kicks.  At the time I was dressed only in my usual uniform.  My legs
> were not protected such that you would be able to withstand a dog's bite.  It
> cornered me into the garage right at the closed door.  I felt in sufficient enough
> danger to resort to using my sidearm.  I did not examine the dog nor did I see any
> report, but I thought I hit it twice.  I never confirm [*sic*] that.  I only learned after
> the shooting that the dog was missing a hind leg.  When the dog was attacking me
> it did not exhibit any type of disabling character in its movements, in fact, just the
> opposite.  [*sic*]

Ex. 2.  In an interoffice correspondence letter to Chief of Police Charles A. McClelland Jr., in

response to a complaint, attached to the affidavit, Simpson went into further detail about his

actions after hearing the dog's aggressive barking:

> I quickly turned my head and observed a medium-sized yellow, mixed-breed dog,
> with its ears folded back along the top of its head, its teeth showing, its head
> lowered, and standing in an aggressive stance.   The dog appeared to have come
> from an open closet along the north wall of the garage.  As I turned my body to
> face the dog, it began to charge toward my legs, while snapping its teeth and
> turning its head sideways so that it could bite my leg.  I quickly kicked the dog
> with my right leg, forcing it backward, but it quickly recovered from the blow and
> continued to charge toward my legs, while snapping its teeth and barking
> ferociously.  I quickly sidestepped to my left in an attempt to evade the dog, but it
> followed my legs precisely and continued to aggressively approach.  I kicked the
> dog again with my right leg, forcing it back.  As I continued to sidestep, I felt my
> left shoulder brush up against main [*sic*] garage door, and I turned my back
> against the door so that I could focus on the aggressive dog.  Again, the dog
> seemed to be unaffected by the second kick and already returning in an extremely
> aggressive manner.  I realized that I had no where else left to retreat, and I drew
> my duty weapon.  I pointed my forearm at the dog, and I fired one time.  It
> appeared initially as if the shot knocked the dog off its feet.  It seemed to fall,
> with its legs sprawling from underneath it, and collapse flat onto the floor.
> However, the dog quickly stood up again and continued its aggressive charge.  At
> that time, I fired a second shot, and the dog again collapsed onto the floor and did
> not stand up again.

Eye witness Officer Damian Garcia declared,

> From what I observed that day it was clear that the dog was aggressively trying to harm officer Simpson such that Simpson had to take the steps to discharge his firearm.  The dog was not a small dog.  It was fast, aggressively snapping and biting at Simpson's legs.  It cornered him into the garage right at the closed door.  While I was the victim of a bullet that ricocheted off the floor and struck my shoe, I can see how Officer Simpson could have felt in danger.  I only learned after the shooting that the dog was missing a hind leg.  When the dog was attacking Simpson, it did not exhibit any type of disabling character in its movements, in fact, just the opposite.  [*sic*]

Ex. 3.

In his expert report, McKinney noted that "in Ms. Grant's statement to IAD she states that the dog had been aggressive in the past and she heard the dog aggressively barking from the garage area prior to the shots being fired." Ex. 7 at p. 5.  McKinney further stated,

> After a thorough investigation into Officer Simpson's actions it was determined that the discharge of firearm by the officer in this situation was justified.  I agree with the finding of the IAD investigation.  Given the actions of the dog in attacking and continuing to attack and attempting to bite the officer, I believe it was reasonable for the officer to be in fear of serious bodily injury from the aggressive dog.  I also believe that the officer's use of force in this situation was reasonable to protect him from serious bodily injury.

*Id.* at p.6.  Moreover the Crime Scene Reconstruction Report (Ex. 8), which examined the physical evidence of the shooting in the garage, corroborated Officer Simpson's account.

Because Officer Damian Garcia was struck by the discharged firearm, an investigation was performed by the Internal Affairs Division, Homicide Division, and Crime Scene Unit, and the expert reports came back finding the shooting justified.  Exs. 5, 6, and 7. They reported that Grant had conceded that the dog had been aggressive in the past, the reason why it was kept locked up, and that she was not surprised it was aggressive on that date.

Defendants' motion for summary judgment points out that Grant fails to plead, no less prove, a cause of action against the City of Houston to sustain a § 1983: she does not identify a policy of a Houston City policy maker that caused Grant to be deprived of her dog without due

process of law.  She alleges no policy statement, ordinance, regulation or decision that was officially adopted and promulgated by the municipality's lawmaking officials or by an official to whom lawmakers have delegated policy-making authority that was the moving force behind her alleged constitutional violation.  Nor does she identify a widespread practice of City officials or employees of shooting attacking dogs that is so common and well settled as to  constitute a custom that fairly represents municipal policy.

This Court agrees that she not only fails to plead, but to prove by a preponderance the evidence that the City of Houston is liable under § 1983.  The only custom or practice of alleged conscious indifference that she appears to challenge is that HPD's Tactical Unit (specifically Officers Naquin, Russell, Garcia, Bocanegra and Simpson) lacked training regarding animal control.  She claims that the media has focused on HPD's "extremely high incident of dog shootings," and that in August 2011, the Office of Community Oriented Policing Services, a component of the U.S. Department of Justice, issued a report, *The Problem of Dog-Related Incidents and Encounters*, suggesting that police departments add specialized training to teach officers how to safely interact with dogs.  Such evidence is inadmissible hearsay, without personal knowledge of no less relevance to the specific circumstances of the shooting of Grant's dog.  Moreover there is no evidence of an established constitutional requirement that police departments have such training.  Nor does Plaintiff show this failure to train was the moving force behind a violation of her Fourth Amendment rights.

As for the individual HPD police officers, Defendants maintain that they have qualified immunity in their unofficial capacities.  Their conduct, in particular Simpson's, did not violate any clearly established constitutional or statutory rights of which a reasonable person would have known.  There is no evidence that Simpson shot the dog without good cause and in bad faith.

The shooting was justified because he was caught off guard and cornered by a snarling dog. *Vasquez v. City of San Antonio*, No. 04-05-00707-CV, 2006 WL 1539336 (Tex. App.--San Antonio 2006)(officer justified in shooting a pit bull that cornered him aggressively and "section 1983" & has qualified immunity from suit).   The fact that the officers entered the house in reasonable reliance on a search warrant issued by a neutral magistrate indicates they acted in an objectively reasonable manner of in "objective good faith."   *U.S. v. Leon*, 468 U.S.897, 922-23 (1984).   "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."   *Id.* at 921.   *See also Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986)("It is a sound presumption that 'the magistrate is more qualified than the police officer to make a probable cause determination., and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the professional competence of a magistrate, the office who requested the warrant cannot be held liable.").   Moreover the warrant was based on credible information and observation.   Grant bears the burden of showing that no reasonable officer, under the circumstances, could have thought the course taken by the police was not justified. *City of Lancaster v. Chambers*, 883 S.W. 2d 650, 656-57 (Tex. 1994).   Conclusory allegations of malice will not suffice to subject government officials to trial.   There is no evidence that the police officers acted unlawfully, without good cause or outside the course and scope of their employment.

**Grant's Response (#44)**

Without documentary evidence in support, Grant conclusorily complains that Defendants unlawfully searched an seized her property without probable cause, specifically (1) a 22 caliber pistol even though no evidence existed that it was used during a crime or was in plain view, it

was not listed on the warrant, and she had a Second Amendment right to have it; (2) Grant's cash savings; and (3) her dog, which they shot to death.  She contends they had a constitutional duty to protect her and her property from destruction and harm. She also charges that she was held in police custody without reasonable suspicion and questioned before they got a warrant and before receiving *Miranda* warnings.  She then addresses specific issues.  As a threshold matter, the Court notes that she has not pleaded any of these in her Third-Party Complaint, despite the heightened pleading requirements to defeat qualified immunity of the individual officers.

Regarding the protective sweep, Grant argues that no officer has been able to articulate any facts to support a reasonable suspicion that would have led officers to believe another person was in the residence.  The Court finds this assertion lacks merit.  Officer Cormier testified that he was not sure that the man with the infant whom they initially saw in the back of the house in a window holding an infant and whom they arrested was Thomas Grant "so we continued to search the house of other persons."  #38-9, at p. 26:17-25.  Furthermore law enforcement officers can perform cursory, warrantless protective sweeps after arresting someone pursuant to a warrant if they have the belief that "an accomplice might be inside a house, even when the factual basis is disputable, supports a finding that the drugs might be destroyed or that there might be a threat to the officers' safety.  Even when the arrest occurs outside a house, law enforcement officers may conduct a protective sweep inside the house when the officers have 'reasonable grounds to believe there [are] people inside the house who pose[] a security risk.'" *Alexander v. Smith*, 561 Fed. Appx. 421, 424 (5th Cir. Apr. 9, 2014), *citing U.S. v. Watson*, 273 F.3d 599, 603 (5th Cir. 2001).  As Officer Russell stated in his deposition, Ex. 10, p. 32, ll. 13-20, "Since we were right there at the house, at the door, by the windows, we had to make sure that no one else is in there. Since we were going to be with our suspect, who has a child, we're going to be in that--in that

vicinity of the doorway and the windows, we needed to make sure that no one else is in that house that could harm us or harm him or anyone else in the area."  Officer Cormier testified during his deposition that he did not know for certain that the person they took into custody was Thomas Grant:  "I did no know it that was Mr. Grant; so we continued to search the house for other persons."  #38-9, Ex. p at p. 26:24-25.  Additionally the officers had concern that other vulnerable children might be inside since Thomas Grant had a child in his arms when observed before and during his arrest.  Furthermore, he was arrested for violating his probation by smoking marijuana; that he was also seen flushing something down the toilet when he saw the police surrounding the house raises the possibility of possible destruction of drug evidence by another person in the house.

When asked, both Grant and her brother refused consent to search.  Grant cites to her statement in her deposition testimony, Ex. 15 at 55, ll. 15-19:  "I said, Well, it looks like you've already searched my home.  I said, The cabinets are open and this gentlemen is telling me about or asking me if I made skin-care products.  How would he know if he has not been through my things already?"  This statement is a question, clearly speculative, and there is no corroboration to support its content.

Officer Bocanegra's sworn affidavit for the search warrant included the statement, "Officer Cormier advised that during the sweep, he observed the bottle Grant had been emptying into the toilet contained residue of what he knew through training and experience to be Promethazine cough syrup containing codeine, a controlled substance.  He also stated that he observed some of the syrup residue around the toilet."  #38-1, Ex. 3.  Grant highlights the fact that Officer Cormier admitted during his deposition that he did not know what the liquid inside the bottle was.  *See, e.g.*, his deposition testimony, #38-9 at p. 13:10-14:10.  He did testify that he

had arrested people on the street who had codeine cough syrup in little prescription bottles before.  *Id.* at p. 18:418.  However, adding to the suspicion here is the fact that he witnessed Thomas Grant pouring it down the toilet after Grant saw the police officers securing the house to effect his arrest and that it was in what appeared to be a prescription bottle.  *Id.* at p. 25:2-21.  He stated during his deposition, "I was not sure if it was codeine or not.  It was just suspicious behavior at that point."  #38-9 at p. 22:24-25.

Grant complains that she was detained without reasonable suspicion and was not free to leave once she arrived at her residence and that she was subjected to a custodial interrogation without being read her *Miranda* rights.  As Officer Russell explained, once Grant was inside the house, she was not free to wander around or to leave or to use her phone--it was "an active crime scene."  #38, Ex. 10, p. 35.  As for allegation that she was not given her *Miranda* warnings before being questioned, *Miranda* warnings need only be given prior to "custodial" interrogation. *U.S. v. Pofahl*, 990 F.2d 1456, 1487 (5th Cir. 1993).  "[A] Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda.*"  *U.S. v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988)(*en banc*).  "A suspect is 'in custody' for Miranda purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement to the degree which the law associates with formal arrest."  *Id.* at 596.  "Interrogation" refers to "words or actions that the police should know are likely to elicit an incriminating response from the suspect."  *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989).  In general the Fifth Circuit has "held that custodial interrogation requires some combination of isolation, restriction of movement, physical restraint and coercive technique.  For example, in *United States v. Cavazos*, [668 F.3d 190, 194 (5th Cir. 2012)], we held that the hour-long questioning of a defendant who was roused from his bed by

fourteen officers executing a search warrant, handcuffed, and separated from his family during questioning constituted a custodial interrogation." *U.S. v. Salina*, 543 Fed. Appx. 458, 463 (5th Cir. 2013).   Police questions seeking biographical information for purposes of booking in a suspect do not constitute interrogation. *Id., citing U.S. v. Menichino*, 497 F.2d 935, 941 (5th Cir. 1974).   Grant's questioning at this stage, prior to the search pursuant to the search warrant, did not reach the level of custodial interrogation for *Miranda* purposes.   Moreover, in her own response, Grant states [*sic*], "At 2:20pm, Officer Comstock read Plaintiff her legal warnings per Miranda.  [Ex. No. "44"] and Ex. No. "45", pg. 2.016]  Approximately 30 minutes later Officer Bocanegra questioned Plaintiff."  #44 at p. 19.

When Grant arrived home wearing scrubs, she had vaguely stated that she worked at a clinic "off the Loop" and that "she was a 'provider,' pausing for a minute and then saying something to the effect of, "I do, like, home health care.'"   Bocanegra Affidavit, #38-1, Ex. 3 at p. 2.  There was nothing to suggest that Grant, rather than her brother, was under formal arrest or that she was subject to such a formal restraint until, as stated in Bocanegra's affidavit, during the search of the house pursuant to the warrant, in addition to the large amounts of cash discovered in the bedroom closet, Bocanegra found three different prescription pads with the names of Iesha Grant and of William Mack, M.D., with three different addresses and different DEA license numbers.  With her education and training, Bocanegra's affidavit pointed out the fast growing epidemic in large metropolitan areas of "pill mills" and of individuals with or without medical training opening up "clinics" and dispensing prescription medications for such drugs as Hydrocodene (Vicodin and Lorcet), Alprazolam (Xanax), and Soma, resulting in skyrocketing emergency room visits and drug-impaired driving.  Up until this point the police officers' suspicions had been focused on Thomas Grant because of the arrest warrant.  With the evidence

Bocanegra had just found, however, Bocanegra's sworn affidavit avers that she "approached Iesha Grant, who was given her legal warnings, and advised that she could refuse to speak with me, to ask her some questions about the prescription pads and currency found inside her residence.  Ms. Grant acknowledged that she had received her legal warnings and agreed to speak with me." #38-1, Ex. 3, p. 004 (electronic page 16 of 36).   At this point the questioning of Grant was no longer routine, but intended to elicit a possibly criminally self-incriminating response from Grant.

While Grant frequently contends that items seized were not covered by the search warrant, that document gave the police officers "the authority to search for and to seize any and all ITEMS RELATED TO DRUG AND OR CONTROLLED SUBSTANCE POSSESSION that may be found therein including, but not limited to PAPERS, BAGS, BOTTLES, CONTAINERS, NARCOTICS, DRUGS AND DRUG PARAPHERNALIA." #38-1.   The inventory filed after the search indicated that they had seized four items: "codeine, approximately 5.1 gms; other liquid, aprox 98.5 grms; pistol, Jennings .22 loaded pistol; money-$35,582.00 to be seized." *Id.*  Parolee Thomas Grant was a convicted felon, not permitted to have firearms, and given the circumstances the loaded pistol could well have been involved in drug trafficking by him or by Iesha Grant.  Officer Bocanegra's current information report states that "Charges are pending on Iesha Grant for PCS ("Codeine")." *Id.*  Officer Steve Fisher reported that Kinta alerted to what proved to be half a green ecstasy pill on a shelf and to a closet in which U.S. currency was found. *Id.*; #38-4 Fisher-B and -C.

Grant complains that Officer Bocanegra's affidavit was not sufficient to support a finding of probable cause by the magistrate for a search warrant because it misrepresented that Officer Cormier concluded that the bottle Grant had been emptying into the toilet contained residue of

what he knew through training and experience to be Promethazine cough syrup containing codeine, a controlled substance.  The Supreme Court, applying a totality-of-the-circumstances analysis, has opined,

> The task of the issuing magistrate is simply to make a practical a common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of person supplying hearsay information, that there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed.

Grant's remedy if the affidavit was deceptive and misled the magistrate or if it was "bare bones" and  inadequate to show probable cause was to file a motion to suppress evidence obtained in violation of her Fourth Amendment rights.  *See, e.g., U.S. v. Brown*, 567 Fed. Appx. 272, 281-83 (5th Cir. May 12, 2014).  She does not allege whether the evidence seized during the search was ever used or attempted to be used against her or her brother or whether they moved to suppress and if so, the result.  Moreover, as argued by Defendants, there is a good faith exclusion to the Fourth Amendment.  Bocanegra's affidavit in support of the request for the search warrant (#38-2, Ex. 3, Bocanegra-B) details the police officers' execution of the arrest warrant on September 1, 2010 on Thomas Grant because of his use of drugs during his probation, including Thomas Grant's emptying a bottle of liquid into the toilet.  The Court finds that it provides the magistrate with a substantial basis for determining the existence of probable cause for a search for drugs and drug-related items specified in the search warrant.

Regarding the search by Officer Fisher and Kinta, Grant argues that studies of U.S. currency for contamination by cocaine have found that 92-97% of bills tested were contaminated with measurable amounts of cocaine.  Since the State of Texas has returned the cash to Grant, the issue is moot.  Grant further argues that Kinta is not certified in the detection of prescription

31 / 32

drugs and the only substances found in the bedroom and bathroom were 10.3 grams of prescription drug codeine and 0.1 grams of N-Benzylpiperazine (BZP). Kinta was only certified on six controlled substances:   cocaine, heroin, methamphetamine, and methylenedioxy-methlamphetamine (MDMA or Ecstasy).  It appears Grant is arguing that there was no probable cause for a canine search.  Because Thomas Grant allegedly violated his parole by smoking marijuana and was seen pouring a suspicious liquid in a prescription bottle down the toilet, there was probable cause for a search for commonly used controlled substances.

Regarding the shooting of her dog, Grant argues that Dr. John Otto, DVM, viewed crime scene photos and stated that it appeared that the dog was shot from behind and fell where he was shot, contradicting Officer Simpson's version of the events.  She also challenges HPD's crime scene reconstruction, citing testimony that because it was a dog shooting,  proper investigation protocols used where a person is shot were not followed.  She fails to show any existing legal requirement that such procedures should have been followed.  Moreover, Defendants have presented facts in sworn testimony showing that under the circumstances, to a reasonable person Simpson's shooting of the attacking dog was reasonable.

In sum, the Court concurs with Defendants that Grant has failed to prove that the City of Houston is liable or that the police officers are not shielded from suit by qualified immunity.

Accordingly, the Court

ORDERS that Defendants' motion for summary judgment is GRANTED.   A final judgment will issue by separate order.

SIGNED at Houston, Texas, this 30th day of September, 2014.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE